1-4-6-5-0-8, Victor Taylor v. Thomas Simpson, Arguments Not True, 30 minutes per side. Mr. Burke, the floor is yours. Good afternoon. Good afternoon. Will you please report? My name is Dennis Burke and I and Tom Ransdell are representing Victor Taylor. And if I could have five minutes for rebuttal, please. Very well. Today I'm going to be addressing both, there are, well, technically three, but two very important issues, which are the issues raised in the brief, the Batson v. Kentucky claim and the Confrontation Clause claim under Ohio v. Roberts or Crawford v. Washington. I'm going to start with the Batson v. Kentucky claim. Now this was a trial that began before, while the Batson case was on appeal before the U.S. Supreme Court. And the decision actually came down, I believe, two days after the verdict in this case. So it applied to Mr. Taylor's case on appeal. Oh, it applies because the Supreme Court has ruled that Batson's retroactive. Correct. Right. Which may or may not be good law, particularly for this case, but that's what the law is. And it would have been in any event because it was well before the appeal came down. In any event, what happened in this case is that in the jury voir dire, the prosecutor used eight of his nine peremptory strikes and four of those strikes he used to remove black jurors and the remaining four to remove white jurors. And after he did that, the defense counsel objected that the prosecutor had used 50% of his strikes to remove 66.7% of the black jurors. And indeed he had. That is, of course, 66.7%. But in addition to that, he removed only 12.5% of the white jurors that were qualified to sit on Victor Taylor's trial. On appeal, the Kentucky Supreme Court ruled that it was not enough that, well, the court said it wasn't enough to just simply object to the race of the jurors that were struck and that he was also required to present any other available evidence in support of an inference of discrimination. Now, as an initial matter, the Supreme Court in Batson held that it is enough to make an argument based on the pattern of strikes of the particular veneer, which is what was done in this case. What do you mean by pattern? Well, in this case they argued that four of six black jurors were removed. So that's just the sheer number? Right, and explained that it was 66.7% of the black jurors were removed, which is similar to what happened in Batson itself. What does the language in Batson that says that the court must consider other relevant factors, what does that mean? Does that detract from your position that it is enough to simply show the number and percentage? No, I mean, I point that out to the court. There are several other factors or circumstances that support a finding of prima facie discrimination based on race. One of them, I assume, would be the absolutely incomprehensible statement of the prosecutor. No one reading that could ever figure out what he actually said. But casting that aside, one of the questions that I've had about this case, and maybe it's in here someplace and I've just missed it. Is it a fact that the prosecutor's chart, which showed the reasons, was part of the record in the state courts? Yes, Your Honor. It was made part of the record on, I believe, April 1st, which was before the strikes were actually made. But he presented it as to show that he had used it to make sure there was a cross-section of the community on the jury, and so that was made part of the record. Did that chart also indicate the race? It did, Your Honor. I thought so. Yes, every single one of the jurors, it includes either white or black, and it's significant not only because that is – well, Mr. Taylor asserts that that, on its face, presented – I'm sorry, that the prosecutors, when he said, I have no other rational reason in accordance with case law as long as I – I believe he said, if I remove all, then it's objectionable. Well, the book that I suppose he was fouling was the Kentucky Prosecutor's Manual book, Kentucky Prosecutor's Handbook, which actually instructed the prosecutors to remove minority jury pool members if you have a minority defendant who's being tried, who are no jurors, the juror of a racial or national background similar to that of the defendant. Yes. I mean, what he's doing, he's fouling the manual, and any other reason he says, no, there's no other rational reason, I'm excluding him because of his race. Right. I mean, that's obvious to me. It was less obvious to me because I thought it meant I don't have to have some other reason stated. Well, I think the fact that he said, I have no other rational reason, and in the context of that conversation, they had been talking about striking the jurors based on race. The Commonwealth – I mean, the defense had objected to the striking of black jurors. There was some discussion about how many had been struck, et cetera. And then he said, I have no other rational reason. So in the context of talking about race and then saying he didn't have any other rational reason, as long as he didn't strike all, meaning all black jurors. Where does that come from? He said it was some California case. I mean, I don't know what that's about, but I mean, this is back in 86. Right. Was there a California case? He said if you had struck all the members of your race from the jury except one, it was fine? That seems like an odd rule. Well, the California case is actually pretty much a precursor to Batson as far as it laid out the steps to be taken that were very similar to what Batson decided. But I think they're relying on that there was a circumstance where it was found that it wasn't discrimination because not all the black jurors were removed. And here there was one African-American that stayed on the jury, right? There was one African-American who remained on the jury. But I do think, given the evidence, including, like you said, the prosecutor's manual, that they were found and it was in the Commonwealth Attorney's Office. Could I interrupt, counsel? Sure. How is that prosecutor's manual part of the record in Mr. Taylor's case? Well, it's part of... I'm sorry? I asked if it was part of the trial record. It is the manual part of the record? Right. Well, it is. So it was not in the record at the time of the trial, but it was introduced in the 1142 when the court considered for the second time whether or not there was an equal protection violation at the trial. And they decided under... Now, counsel had raised it, 1142 or the post-conviction counsel, under Swain. The court observed that the actual law is, of course, Batson and theorized that perhaps they were doing that in order to get around a rule that didn't allow them to raise the Batson claim a second time. But, nevertheless, decided the claim and still found... This is the number. I'm still trying to figure out where it's in the record. You said a procedural number, some motion. Is this the post-conviction release motion? Yes. And is it in the motion itself or is it in the amendment that came later about which there is some dispute that it was forfeited, that it was untimely two months later? Is it in that? I think it was presented later where there was no objection to that by the Commonwealth and it was actually decided. And there was no mention of that either in the state court opinion. Okay, I read it in the briefing, but maybe it was not challenged? It certainly was not challenged. Okay. All right, thank you. Then that's where this manual comes in. It does. Do we need to be talking about that if the issue concerns what exactly happened the day it's filed and the records that the state filed in support of its rationale? Okay, so what the state filed was the chart that I believe Judge Griffin was asking about. And that is in the record. Well, it's in both records, but it's at 73-2 in the federal district court record now. And that is what they relied on, just that single chart where they listed what they considered to be the topics, education and profession or jobs. So less than high school, high school, college. Right, right, I got it. That's the only thing that the Commonwealth relied upon. And they didn't even do that on the strikes. So that was in prior to the strikes being made. It's really difficult, I'm sure, to have me on the phone, so we have to take turns. But the Commonwealth relied on the records counsel submitted about this chart. And there also, I lost my point. I'm sorry. I thought there was one other thing I wanted to say, and I'll come back to you.  Thank you. All right. This case arises from Jefferson County, Kentucky, the prosecutor's office there, which is the same county that Batson v. Kentucky arose. Yes, Your Honor. What strikes me is Batson's trial was in February 1984 with the Jefferson County prosecutor. This case was March and April 1986, two years and a couple months afterwards. It's also Jefferson County, Kentucky. It strikes me the similarities between this case and Batson are significant. Are there differences in this case with Batson, or is it on all fours with Batson? It's on all fours with Batson. In fact, other than the fact that, well, in Batson they removed all of the black tracks. There was no African, there was not a single African. Right, right. That's also why, when we're looking at an inference of discrimination based on race, that's one of the factors that needs to be considered, is that both Batson and Griffith were both out of Jefferson County, Kentucky, the very same Commonwealth Attorney's Office. The same practices, and the same, I mean, this is two years later. That's right. Batson hasn't been decided. They assumed what they were doing before was fine. In fact, they were defending the Supreme Court. Right. So, they had no reason to know that what they were doing was wrong either, I guess, because... Well, yes, which isn't really what matters, is that they were intentionally striking jurors based on their race. I remember my point, please. The counsel left one challenge on the table and left one black juror on the panel, correct? Well, actually, that would have left two black jurors on the panel and then... I realize another one was taken off for another reason by the prosecution. But he left one on. It was four of six, actually. The prosecutor left two African-American jurors on, and then the defense struck one. And so, that's why there was one remaining. I realize that, but he had another challenge that he did not use against the last black juror, right? That is correct. So, even if no other rational reason for the strike is not considered a race-positive explanation for removing the jurors, it's still an inference that the Commonwealth struck based on race. So, what are the other... You said there were other relevant circumstances to be considered here, when I asked the question about what did the Batson Court mean by that. So, what were the other... Those other relevant circumstances are the fact that Batson and Griffith were both decided in the very same Commonwealth... occurred in the same Commonwealth Attorney's Office. That the Commonwealth struck 66.6% of the black jurors. That the Commonwealth used a chart in which they acknowledged they used to strike the jurors, in which they listed the race of the jurors, every single... either black or white. And what's also important about that is that they... This was not a circumstance where they were just using it as a descriptor, like, say, to remember what the jurors looked like, somebody with a beard or glasses or what have you. This was... the only physical characteristic on that chart was the race of those jurors. Alright, and if the Kentucky Prosecutor's Handbook is in evidence, and I guess maybe there's dispute, that's other evidence too, isn't it? Because it actually tells them to do it. Yes, all of those... That if you have a minority defendant, you should exclude minority members from the jury. Yes. And it's right in here. Yes, Your Honor. And so, if we need other evidence, which I don't think we do, by the way, I think Batson says right in the opinion that these principles support our conclusion that a defendant may establish a prima facie case for purposeful discrimination in the selection of a petite jury solely on evidence concerning the prosecution's exercise of preemptory challenges at the defendant's trial. I mean, they're saying solely. But, if I could ask a question about that. Sure. Isn't that language... In fact, could I see it so that I don't misquote it? Sure. Because I spent some time trying to figure this out last night. The defendant may establish a prima facie case of purposeful discrimination in selection of a petite jury solely on evidence concerning the prosecutor's exercise of preemptory challenges. I think evidence concerning, at least arguably, goes beyond the mere fact of the strikes. Except then we look at Batson and what happened in Batson. The only objection... But then my next question is, before you get to that, but I mean, hold that thought. I've got the other parts highlighted. Thanks. Because, going through, the next thing they say is, to establish such a case, the defendant first must show that he's a member of a cognizable racial group. No issue there, at all, here. And that the prosecutor has exercised preemptory challenges. So, if that evidence concerning meant only that, then they wouldn't have to list this as a specific item. Second, the defendant is entitled to rely on the fact as to which there can be no dispute that preemptory challenges constitute a jury. No question about it. Nobody's arguing about that. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude. And that's where my concern is. Any other relevant circumstances. Clearly, that goes beyond the mere fact of the strikes. Except, again, remember the language where the court said that it's enough, if there is a, or it may be enough, based strictly on the pattern of strikes that were done from that particular veneer. And that was the objection that the defense made. That they struck four of six black jurors that were remaining. So, 66.6%. That's the pattern of strikes. How many preemptories did the prosecution have in the trial? There were eight. So, he used half of them. He used 50%. To exclude the African Americans. Correct. And they only made up about 15%, a little less than 16% of the jury pool. So, he uses half of them. See, I could see that maybe if you only excluded one member of the defendant's race, that you'd say, well, you really need some other evidence here. Just excluding one member, maybe it's not enough to establish a prima facie case. But here, when you exclude four of them and use half your challenges on them, does that arise to a reasonable inference that that's what's going on? I think it does, Your Honor. But even if it doesn't, then there is all the other evidence that needs to be considered that I mentioned. Well, I mean, you look at Batson. This is the same county that the Supreme Court knocked down for their practices under Batson. He was listing the race of the jurors. And then saying, I have no other rational reason as long as I don't strike all. I mean, I think if you put all that together, it's far more than an inference. I mean, that's all that's required to meet for step one. What do you think of their argument that, okay, even if you get past the prima facie level, that at step two they could have raised some nondiscriminatory reasons to justify the challenges? What do you think of that argument? Well, I think it's nonsense for a couple of reasons. One, and perhaps most importantly, that the chart itself that the Commonwealth relied upon was not race neutral. It had the race of the charts. It's impossible to say, oh, they were race neutral reasons when the actual race of the jurors is on the chart. And it's important to note also that somehow that didn't make it into the Commonwealth's argument. They talked about education and profession, but there's nothing about race, even though plain as day it listed the race. Secondly, what the U.S. Supreme Court has said, what they said in Millerell. I want to make sure I understand what you just said. When the Commonwealth did talk about reasons, they didn't talk about race? Say that again. So in the habeas process, we're talking about these are the reasons why. In fact, the judge said, the district court judge said, well, even if I presume there's a prima facie case, now I'm going to look to step two and relied on the chart, as does the Commonwealth, to say, look, these are race neutral reasons. That they could have raised, but didn't raise. But didn't raise, which they're not allowed to do that because of Millerell. Were you allowed under Batson to raise it after the fact? No. Under Batson, do you have to do it at the time? Well, yes. You do have to. Unless, of course. What's the yes? You have to do it at the time? You do. Now, if in fact it didn't get to the second step, and then it got remanded back for a hearing, that may be another circumstance. Can we do that now? Well, it would be extremely difficult to do that now for a couple reasons. One, again, they didn't offer a race neutral reason. They're putting forth a race neutral reason, they say, that was actually, if anything, race positive because it included the race of the jurors. Secondly, this is now 33 years later after the trial, and the trial prosecutor is no longer alive. How come it took so long to get this to the first habeas? I don't know exactly why. There were four appeals in the Kentucky Supreme Court. Right. They had an evidentiary hearing. There's Taylor 1, 2, 3, and 4. Right. And I think the habeas wasn't filed until 2009, I think. Five, I think. Five? Right. That's why it lasted so long. I think the reason for that, though, is because the Kentucky Supreme Court had an opportunity, two opportunities, to make the right decision and didn't. If we're talking about it, of course, the Commonwealth could have conceded the obvious that it was, in fact, based on an impermissible violation of equal protection and didn't. And so that is why. And so here we are 33 years later. In Snyder, the Supreme Court declined to send back for a hearing after only 10 years. And as far as I know, in Snyder, the prosecutor hadn't died. So I think the obvious remedy here is to vacate the conviction and sentence. And that's just on the— Is that the only remedy? I mean, it's obvious, but is that the only remedy that we— No, I mean, you could remand it back for a hearing to determine the— I think it would be futile given the prosecutor is no longer alive and given the fact that what they relied on actually is not race neutral and includes race. But I think you probably could send it back. It would be kind of hard. Yeah, if the prosecutor is not alive, how would—unless somebody knew his thinking or thought processes back then. Right. But that's just the Batson claim. The other claim, of course, that I'm nearly out of time but I think is very important also is the— I think your other claim might be a little weaker because I think we are subject to harmless error there. Yes. In my understanding, Batson is a structural error. It is. So it's not subject to harmless error. The Supremes have never actually labeled it a structural error. As they most recently said in Weaver, they've never labeled Batson a structural error. That's right. But has the Sixth Circuit? Have we? Yes. Yeah, we have. Published opinions that this panel has to follow? Yes. I think we go back to 2009 on that. At least that's the earliest one I've found. There are, Your Honor. But I don't want to disagree. I mean, Batson is—it is a structural error and it is a clear violation of equal protection that happened here. But I also think that it would be a mistake to think that Victor Taylor was not denied a fair trial based on the Confrontation Clause claim as well. Because, in fact, despite what the Commonwealth says about there being an overwhelming case or overwhelming evidence, that is not the case. And reality is—and I don't know if you have the chart, but they refer to a chart, which is on Document 12 of the federal court record, of all of the evidence that George Wade presented, who is, of course, on cross-examined, and then the evidence of the other witnesses. Now, what the Commonwealth didn't say is how significant George Wade's testimony was to supporting those other witnesses, all of whom had credibility issues. We had not one but two jailhouse snitches, both of whom received benefits for their testimony, one of whom actually recanted his testimony until the Commonwealth came through with his deal—or his statement, rather, recanted his statement. When they came through with the deal, which was concurrent time with his other time facing 20 years to life, then he flipped and again claimed that the statement was true. Weren't there witnesses that saw the two defendants with their guns drawn take these boys away and unscone with them? Yes, and it's funny— Were there credibility problems with those other witnesses? There absolutely were. First, beyond the fact that one of them was on probation at the time of trial and hadn't been revoked when there had been conditions he hadn't satisfied and hadn't been revoked, the other one was on probation and actually violated the probation, and the detective from the prosecutors on the investigation for Victor Taylor's case went down to court on his behalf so he wasn't violated. But beyond that, at the time the crime occurred, two days after the crime, both of those witnesses were at the police station. Neither one of them was able to identify Victor Taylor from a photo lineup or photo array. The very first time either one of those people identified Victor Taylor was at trial, and not coincidentally, aside from the prosecutor and the judge, the only African American male in that courtroom was Victor Taylor. So their credibility was suspect, and certainly what they were able to provide to the jury was suspect. But not only that, if you look at the closing argument that the prosecutor made, every single witness, Cecil Pepper and Dino Pace, who are the two witnesses you're talking about, both of the jailhouse snitches, other witnesses, he refers back to George Wade's statement to corroborate weaknesses in their testimony. In fact, the entire theme of his closing argument is the defense has attacked these witnesses. Well, let's go through and let's look, and George Wade says that it supports that. In fact, I went back 22 times in that closing argument. The Commonwealth, the prosecutor relied upon the George Wade statement to corroborate the other testimony, and he used words like verified, compare it to, listen to George Wade's statement, watch his statement. It's not the case, though, that Mr. Taylor, in fact, did at least confess, if not brag about the shootings to some people? And every single one of those witnesses, which again, the two jailhouse snitches, and this other woman by the name of Beverly Shackelford were wholly impeached at trial. The fact of the matter is Beverly Shackelford, she testified that she had actually been three times that Victor Taylor, who was not friends with her, that he had walked by her and she had heard him bragging about it. And yet, just two days after this supposedly happened, she was interviewed by the police and didn't mention it at all. And then she claimed that she had heard it two more times after she spoke to the police, which is on October 3rd, and Victor Taylor was taken into custody at 4 a.m. on October 4th. So the likelihood of her testimony being true, and the jury, again, was cognizant of all of that, because the defense did a very nice job of bringing all these problems with the Commonwealth's case to light. And that is why the Commonwealth relied on George Wade. When we talk about substantial and injurious to the verdict, or influential to the verdict, one of the things to remember is that the jury actually requested to listen to George Wade's statement for a second time while they were in their deliberations. And then when you look at what the Commonwealth did, in fact, for the murder itself, all of that evidence came from George Wade, the actual eyewitness account. He was the only witness that was able to say that he was there at the time, that he knows it was Victor Taylor because he saw him, and then to say, well, I even tried to talk him out of it, and I had just gone around the corner and I saw two shots, and then he told me why he did it, which was because he didn't want the witnesses to talk. And by the way, the Commonwealth, they pointed to that. When they talked about the jury instructions, they said, here's why you should find him, and I'm paraphrasing this, but they said, let's look at the facts, and what were the facts? George Wade's statement, which they then read, a very succinct but pretty detailed statement, or summary of what George Wade said, and that's just for the murder. They also did it, there are six witnesses that the Commonwealth relies on for the robbery. Every single one of those witnesses, without exception, the prosecutor corroborated that with George Wade's statement. Every single one of them. The same with the kidnapping. In fact, in the kidnapping, he talks about that they were tied up, they were bound and gagged, and then says, and look what George Wade says about that to corroborate these other witnesses. The defense says, don't believe these witnesses, well, look what George Wade said. And those, of course, were uncross-examined, that was an uncross-examined statement. So the fact that it was, the idea that it was not harmful or not influential to the jury is simply wrong. All right, Mr. Berkey, you'll have your five minutes rebuttal. Yes, sir. Or you can use it and save it if you want. Thank you. Good afternoon. Good afternoon, Your Honor. My name is Matthew Kreigel. I'm an assistant attorney general at the Kentucky Attorney General's Office, and I represent the warden in this case. I'll start with the Batson issue because that seems to be the more pressing of the two issues that have been discussed. I want to start with the prosecutor's handbook. The prosecutor's handbook was made part of the record when the 1142 hearing occurred in post-conviction. There was a hearing, and in that hearing they introduced portions of that handbook. Now, the important thing to know about that handbook is it was created in 1975. David Stengel, who was the Commonwealth attorney at the time of the hearing but was an assistant Commonwealth attorney prior to that, testified that he had seen that handbook in a while. No one was using it. They had no policy written or unwritten to strike African-American jurors if they have an African-American defendant. There was absolutely no proof that anyone was using that handbook. And just to give an example, that handbook has – it's very outdated. It talks about not putting women with hats on the jury. It talks about not having or trying to get a Jewish-sounding named juror if you have a German-sounding defendant. It's just – it's very outdated, and no one was using it at that time. And there was never any testimony done. No one in Jefferson County, Kentucky? The other thing about Jefferson County is they get a really bad rap on this case because the Batson case, well, yes, Joe Gutman, the prosecutor in that case, struck four African-Americans with six strikes. But the objection by the defense attorney was that it wasn't a fair cross-section. That's all he said. No other evidence, no – you get the sense when you read Batson that they're abandoning Swain because the burden is so crippling that no one can meet it. And that's not at all what happened here. There was no Swain evidence. There was no attempt to get to that point and then to not get there, and then all of a sudden we need a new remedy. And the interesting part – and this ties into what Mr. Jasmine said, the prosecutor, with regard to the California cases. When Batson went to the U.S. Supreme Court, David Niehaus, who was the attorney who represented Batson, specifically said, I am here because I want you to adopt People v. Wheeler, which is a California case that is a Sixth Amendment case that says that the impartial jury, fair cross-section portion of the Constitution is where we want you to adopt this rule that comes from the People v. Wheeler. The entire time he's arguing, Justice O'Connor – the entire court is like, why – we don't understand why you're not taking Swain head-on here. Why aren't you claiming equal protection? Why aren't you claiming equal protection? Well, they had followed the blueprint in Wheeler, and Wheeler didn't deal with equal protection. So when the fair cross-section argument comes up at the trial and Mr. Jasmine references the no rational reason and the California case, he's simply telling the court that he knows what the holding of that case is because that case dealt with the situation where you have what they refer to as group bias, where you are striking jurors based on the assumption that they are going to be sympathetic to the defendant if they are of the same race. Well, I mean, that's interesting, but Batson has changed the law, and it's retroactive, which I see as the problem for your side. Well, it creates an awkward position because you're analyzing a trial where there was no real Batson hearing because it didn't exist. I think that's the problem with retroactivity. I mean how can you force a new rule on something that's already happened? And the only way to cure the – is have them anticipate it ahead of time that the Supreme Court is going to create new law. But that's – the Supreme Court has said it's retroactive. They have. These rules apply to whether you knew about Batson or not, or you guessed right or not, and I mean you're kind of stuck with it. Well, you are stuck with it. Right, and because it is retroactive, they analyzed it, and the Kentucky Supreme Court found that no prima facie case was shown. All they introduced were the bare numbers. These other relevant circumstances that we're talking about, the handbook and all the fact that it's from Jefferson County, those are all Swain-type relevant circumstances. But they're not Batson relevant circumstances. Batson wants you to look at that particular trial. You look at the pattern of the strikes. You look at any statements by the prosecutor that would show bias. You look at the way he questions. How about the statement that there is no other rational reason for me to exclude him? Again, I think if you – I don't read it to where he is saying that that is what he did. I read that as he is telling the court he knows. The judge actually asked him. There's an objection for excluding the African-Americans from the jury pool, and in response to the objection, the judge says, okay, what else is going on here? And his response was there is no other rational reason. There is no other rational reason. And the way I read that, I'm accused of excluding the African-Americans because I've got an African-American defendant. And he says, yeah, that's the rational reason, and it's allowed. And before Batson, it actually was unless there was a Swain violation. Correct. I guess we just have a difference of opinion on what it means. What did it mean? What do you think he meant by it? I think he's referring – he's trying to foreclose the argument that they're making under the fair cross-section issue. And by quoting or letting the court know, I know what the holding is here. The most recent one from California talks about no rational reason with respect to group bias. And here you've got – the way Batson – Are you talking about group bias? I have no other – That's what People v. Wheeler is all about is group bias. And the Batson attorneys specifically wanted – I mean their brief is we want Wheeler. We want you to adopt Wheeler. That's what they argued. And so when you look at equal protection under Batson, there are two situations. You are protected if you are using preemptory challenges – or you are not protected if you're using preemptory challenges solely on the basis of race or under that assumption for group bias. There's no evidence that Ernest Jasmine was actually using his strikes for – solely for the purpose of – or solely based on race. There is – the evidence that they're saying that I've used to support these race-neutral reasons, that's not why I cited that evidence. The district court did, but I didn't cite it for that. I cited it to show that he was not using his strikes solely on the basis of race. Did he say that though at the time? He didn't say that, but his chart reveals it. Every juror that he struck was either unemployed or underemployed, lowly educated, or had reservations about the death penalty. It would have to be and black. In other words, as I understand the defense counsel, they're saying because race is identified, that makes this not race-neutral. And you're saying these are all of the race-neutral reasons, but we have also identified the race of the jurors. So we don't actually know which one he picked. He could have picked a non-discriminatory reason, or he could have picked the race reason. And because there's no testimony, there's no second step here at Batson. I mean, isn't a reasonable inference going to arise that maybe it is because of the race? Could I interrupt? Sure, Judge Cook. I wondered if it would be utterly unreasonable to think that this prosecutor admits that his only reason is race in the presence of a judge of the African-American race. I mean, it's just bizarre, isn't it? I think you have to consider the historical context of back then that there was nothing to prohibit you from excluding people because of their race, as long as you don't do a Swain violation. Right, there was Swain. Swain has to have that systematic exclusion, but then eventually it has to continue unabated into your own case. So it's not as though he has the ability to do this and there's no repercussions at all. He could be subjecting himself to a Swain violation. He could, but he also could think he could get by with it. No, I think that's one of the problems is we're trying to step back into time from 33 years ago, and things were different. There was no internet, and there was— Right, and it does require a bit of time travel that makes it very awkward to deal with the posture of the case the way it sits. So if a step—well, I guess I won't even ask that. Go ahead. It's our position that no prima facie case was shown. The Kentucky Supreme Court found that that wasn't an unreasonable interpretation of Batson based on all of the circumstances that are here, and not taking into account Swain type evidence that was mostly introduced at the 1142 hearing for a claim that really was procedurally defaulted. They immediately said, well, Batson Control is not Swain, so there is no Swain claim here. With regard to George Wade's confession, I do want to address harmless error, but I would like to say that it is— I think using AEDPA deference that the decision of the Kentucky Supreme Court in Taylor 1 was sound with respect to Ohio v. Roberts and its progeny. You've got a group of cases that all seem to point towards making the statements against penal interest, which in this case, George Wade's statements were clearly against his penal interest. He admits that he was there when the boys were kidnapped. He's the one that tied up their hands after they drove around with the boys tied up. He's the one that tied up their legs. He's the one that gagged their mouths. He's the one that looked through their pockets. He's the one that took off their pants. He's the one that ransacked the car. How do we know all that without his statement? Well, I'm just saying with respect to his statement, it's against his penal interest. Sure, under Roberts. But no, it's unfortunate that there are some of the witnesses do have credibility issues just like George Wade has credibility issues. But there weren't a group of Boy Scouts camping in the projects that night that could come in and testify as to all this that's happened. But what we do have, we have Victor Taylor being seen with a gun taking these boys into a car. We have him going to the home of his mother and telling his sister that he needs to get rid of this gun because he's just killed two white boys. We have his confession to three different people saying that he was the person that pulled the trigger. So while George Wade's confession is helpful because it's one continuous story, it compartmentalizes into a nice little piece. It's not a very revealing or articulate confession. There's not a lot of detail in there. It's very bland. It doesn't give a lot of detail. It spends most of its time just kind of walking through what they did. And to the extent that it does implicate Victor Taylor as the trigger man, again, all the other evidence, including the bullets. I forgot about the bullets, but there were bullets that matched the gun, the type of gun he had that were in his possession. So the confessions interlock enough that I think you get to – Idaho versus Wright, you get to that situation where you look at those totality of circumstances and you see that he's had – he was Mirandized three times. He was given – or he wasn't given any sort of deal. He didn't ask for anything. He didn't ask to curry favor. He didn't take a plea bargain and become antagonistic to Victor Taylor. He actually helped him out by – or tried to by not testifying against him. So he – and when they were interviewing him, they went over the Miranda warning. They talked about coercion. This is what it means. You understand that, right? You're doing this of your own free will. All of those circumstances add up to make the statement have a particularized guarantee of trustworthiness that would make the decision in Taylor 1 legally sound. And I disagree with my opponent to the extent that they say Crawford v. Washington applies because they discussed it in Taylor 3. Again, that was conditioned on whether Crawford was retroactive. It ended up not being retroactive. And interestingly, as we swing into harmless air, Justice Cooper and I think it's Keller, but there are two justices in Taylor 3 that say we don't need to talk about Crawford. Ohio v. Roberts, we were good with that. We don't need to be talking about Crawford v. Washington. But we also disagree that there's harmless air here because without the statement of George Wade, there's no evidence of sodomy. There's no evidence that Victor Taylor was the man who pulled the trigger. But that's clearly inaccurate. It was an opinion that was cited or decided before I got in on the case, so I'm not sure if there was any attempt to modify that opinion. But the sodomy evidence comes completely from Jeffrey Ira Brown after Victor Taylor confessed to him as well as the physical evidence. There's no mention in George Wade's statement about sodomy. Similarly, with regard to who pulled the trigger, again, you've got all the evidence. All the gun evidence points to Victor as well as his own statements where he's running around telling everybody that he's done it. And then he's got his whole family wearing the boy's clothes and all these other things that they're all but advertising that they had done this. Again, even though my opponent wasn't particularly fond of it, the chart in the answer at Record Entry 12, 68 through 71, it does show how every single element of every offense in this case, there is evidence other than George Wade's statement that can support those convictions. Again, I feel like the statement of George Wade has been bolstered to be something much greater than it actually was. And while you could fault the prosecutor or they're faulting the prosecutor for citing to it, again, it was ruled admissible. So why wouldn't he be citing to it when he's making his argument at the end of the case? It would make no sense not to argue it. And as a side note, the fact that George Wade didn't testify allowed Eugene Taylor to be unable to, because of hearsay objections, he wasn't able to testify that George Wade told him about the sodomy the night of the murders. He told Eugene Taylor about the sodomy and he also told him that he begged Victor Taylor not to do it, which is probably one of the only things when you read that statement that you kind of want to roll your eyes at and think, OK, sure, that seems a little self-serving, but there was evidence that would have corroborated that. So I guess in the end, I think there's clearly enough evidence that the statement – that it would have been harmless error to introduce the statement. But again, I would assert that the O'Howie Roberts and the progeny, there was – using an EDPA deference to that, that's not an unreasonable application of federal law. That's it. OK, thank you. Any further questions? Judge Cook? No, I'm fine. Thank you. Judge Badger? Thank you. All right, thank you. Five minutes rebuttal. Thank you. I don't have a lot of time here, so let me first – let me address the confrontation clause argument first. Everything that the Commonwealth said about O'Howie Roberts is wrong. Lee v. Illinois talks about all of the things that the Commonwealth relies upon that makes that statement reliable is that, in fact, makes it unreliable. For example, the fact that he was in custody, the fact that he had been Mirandized, the fact that he had been identified in a lineup, the fact that he – I didn't commit the murder. So it was not a – it was not, in fact, a statement against interest at all. All of those reasons – His only interest was the murder charge? No, no. But if you look at Lee – if you look at Lee v. Illinois, if you look at Brewton and even Idaho v. Wright, they all talk about when you have a run-of-the-mill accomplice confession where they are taking some responsibility but then passing off blame on others, that it is unreliable. First of all, they are presumed to be unreliable to begin with. But if you're determining whether or not they are reliable to get past that presumption, then you look at the circumstances that the statement was given. So that statement – all those things that I just talked about are indications that it's not reliable, that it was given to the police while he was in custody after they confronted him and said, you've been identified in a lineup, on top of which he denied that he committed the murder and pointed to Victor Taylor. All of those things, straight up in Lee v. Illinois, it is contrary. There's no question that's contrary to clearly established federal law. Secondly, the Commonwealth relies on the fact that it was – and the Kentucky Supreme Court – that it was corroborated by evidence within the trial. Also, strictly forbidden in Idaho v. Wright, where the U.S. Supreme Court reversed for that. Every single one of the reasons provided by and endorsed by the Commonwealth is actually the opposite of what it says, that it was unreliable and it was not admissible. Secondly, as far as the fact that it was – that I didn't like the chart that the Commonwealth pointed to, the opposite, I love the chart, and here's why. Because if you compare that chart to the closing argument, that explains why George Wade's statement was so harmful to Victor Taylor. Because the Commonwealth used George Wade's statement to bolster all of those witnesses that were otherwise very questionable and to corroborate their testimony. I ask you to just go back and look. Like I said, 22 times he pointed to that statement of George Wade to say that it was not – to corroborate the testimony of those witnesses. That is not accumulative, what they were claiming. That is actually substantial and injurious to the verdict and influential upon the jury. That is harmful, not harmless. I want to turn a little bit also to the Batson claim. Well, if we agree with you on Batson, we don't have to deal with the confrontation issue, do we? You do not. So let me address that quickly, and I don't have much time. The Commonwealth makes this argument somehow that all of the evidence that was brought in was evidence of a Swain violation and not a Batson violation. First of all, all of the things that I mentioned before, the fact that it came from – the Batson came from the same Commonwealth attorney, the Griffiths came from the same Commonwealth attorney, the juror chart that listed the race, the fact his comments itself, no other rational reason, all of those don't have anything to do with systemic discrimination. Regardless, that argument is also completely wrong because in Ford v. Georgia, the U.S. Supreme Court said – there was a very similar claim where they said, well, you didn't raise Batson. And what the U.S. Supreme Court said is that Batson subsumes Swain. Anything that's raised in Swain also applies to a Batson violation. So the idea that all of the Swain evidence, the so-called Swain evidence, doesn't apply to Batson is simply wrong. The fact of the matter is the Equal Protection Clause under Batson, the whole point of it is to stop discrimination based on race against minority – at that time, minority jurors. That's the entire point of the Equal Protection Claim, of the Batson opinion. So the idea that somehow this systemic discrimination based on race doesn't apply to Victor Taylor's case is simply not true. It's contrary to U.S. Supreme Court precedent. In fact, it supports even more so this argument – or not an argument, the reality – that Victor Taylor was discriminated – that the government discriminated based on race in their jury selection in violation of the Equal Protection Clause. And that this court should grant the habeas both for that reason and vacate the conviction and sentence, and also for the Confrontation Clause question. Because for both claims, Victor Taylor is denied a fair trial. Thank you. All right. Case will be submitted. With that, you may adjourn the court.